David C. **MOORE**, 92–A–6533, Plaintiff

v.

Deane **GARDNER**, Richard Gantert, Mike Furman, Michael McGinnis, Richard Cerio, Richard Morse, Terrence Cleveland, Chris Hughson, James Ameigh, Richard Murphy, and Daryl Shaw, Defendants.

No. 00–CV–6076 CJS.

United States District Court, W.D. New York.

March 12, 2002.

David C. Moore, Malone, NY, Pro se.

Charles D. Steinman, New York State Attorney General, Darren Longo, Asst. Attorney General, NYS Attorney General's Office, Rochester, NY, for Defendant.

## DECISION AND ORDER

SIRAGUSA, District Judge.

This is an action in which the *pro se* prisoner plaintiff is suing various employees of the New York State Department of Correctional Services ("DOCS"), pursuant to 42 U.S.C. §§ 1983 and 1985. Now before the Court is plaintiff's motion for summary judgment [# 40] and defendants' cross-motion for summary judgment [# 45]. For the reasons that follow, plaintiff's motion is denied in its entirety, and defendants' motion is granted in part and denied in part.

## BACKGROUND

Plaintiff, an inmate at Southport Correctional Facility, commenced this action on February 26, 2000. The general facts of this case were set forth in an earlier Decision and Order [# 6] of this Court. It is sufficient at this point to note that, while plaintiff's complaint contains eighteen[1] causes of action, he is essentially asserting four claims: 1) that, on multiple occasions, defendants Gardner, McGinnis, Morse, Cleveland, and Murphy, conspired to violate, and did violate, his civil rights by withholding his mail, reading his mail, and disposing of his legal documents; 2) that on August 29, 1998, defendants Furman, Gantert, Hughson, and Ameigh, acting with deliberate indifference, failed to protect him from an assault by another in-

---

**1.** The Complaint originally contained thirty-two causes of action, but the balance were dismissed in a prior Decision and Order.

mate; 3) that, on September 8, 1998, defendant Cerio, in his capacity as a Disciplinary Hearing Officer, convicted plaintiff of refusing to obey an order, despite a lack of evidence; and 4) that defendants McGinnis, Morse, Cleveland, and Shaw, acting with deliberate indifference, deprived him of his bed linens during cold weather.

On February 7, 2001, plaintiff filed a motion for partial summary judgment [# 40] as to defendants McGinnis, Morse, Gardner, Shaw, and Cleveland, with regard to claims 1, 2, 3, 5, 7, 8, which pertain to some of the alleged instances of mail and legal tampering, and as to McGinnis, Morse, Cleveland, and Shaw, with regard to claim 29, which pertains to the alleged deprivation of his bed sheets.[2] In support of the motion, plaintiff has submitted an affidavit, in which he essentially reiterates the allegations contained in the complaint, documentary exhibits, consisting primarily of correspondence between plaintiff and various prison officials, and inmate grievances concerning alleged violations of prison procedures. Plaintiff indicates that he is entitled to summary judgment, not because there are no triable issues of fact, but because "the preponderance of the evidence weighs in [his] favor." (Plaintiff's Declaration, ¶ 6; Plaintiff's Brief, ¶¶ 16, 23, 41, 42).

On May 25, 2001, defendants McGinnis, Morse, Gardner, Cleveland, Murphy, Shaw, and Cerio filed an opposition to plaintiff's motion, as well as a cross-motion for partial summary judgment [# 45].

Defendants' first ground for summary judgment is that many of the claims in the instant case are barred by a settlement agreement from an earlier proceeding, 98–CV–6554 CJS. It is necessary, for purposes of analyzing defendants' motion, to summarize the facts of that earlier matter. On December 1, 1998, the plaintiff, David C. Moore, commenced case number 98–CV–6554 in the United States District Court for the Western District of New York, against the following individuals: Glenn Goord, Commissioner of the New York State Department of Correctional Services ("DOCS"); Michael McGinnis, Superintendent of Southport Correctional Facility; Deputy Superintendent Richard Morse; Captain Rocky Hazelton; Lieutenant Palmer; Sergeant D. Shaw; Corrections Officer Edwin Huffner; Corrections Officer James Santos; Corrections Officer James Moss; Corrections Officer M. Furman; nurse Kathy Felker; and nurse Paul Daugherty. In that action, plaintiff alleged that, on October 4, 1997, Huffner, Moss, and Santos, assaulted him, while Shaw observed the incident but failed to intervene. Plaintiff further alleged that Felker and Daugherty acted with deliberate indifference to his medical needs, by failing to treat the injuries he sustained during the alleged assault. Plaintiff also contended that subsequently, Huffner and Santos issued false misbehavior reports about the incident. Additionally, plaintiff claimed that he wrote letters about the incident to McGinnis and Goord, but that they took no action, and that, subsequently, defendant Palmer conducted an unfair disciplinary hearing of the charges against him. Plaintiff's complaint also referred to a disciplinary report which Furman wrote against him on August 30, 1998, and alleged that McGinnis unfairly suspended his visiting privileges on September 6, 1998, and that, between October 4, 1997 and August 29, 1998, Goord, McGinnis, Morse, and Hazelton, unlawfully imposed

---

**2.** Plaintiff indicates, in his affidavit, that defendant Morse defaulted as to claims 3 and 29, by failing to deny them in his Answer, however, that is incorrect. *See,* Morse Answer [# 20], ¶¶ 1–4.

deprivation/restraint orders against him. (98–CV–6554 Complaint [# 1] ).

On October 12, 1999, in connection with that lawsuit, plaintiff wrote to the clerk of this Court, asking that he be provided with copies of his filings, because the "jail" had destroyed his copies of his legal papers. Plaintiff also indicated that he had filed inmate grievances against the "jail for destroying [his] law work." On December 9, 1999, during pre-trial proceedings in that case, plaintiff submitted an affidavit [# 10] to the Honorable Jonathan W. Feldman, United States Magistrate Judge, complaining that Ms. Deane Gardner, Senior Mail Clerk at Southport, was unlawfully prohibiting plaintiff from receiving certain mail. More specifically, he alleged that, on November 23, 1999, Gardner had improperly returned mail which had been sent to him by his friend, Linda Maricle, who was assisting him with the typing of his legal papers. Plaintiff asked Magistrate Judge Feldman to direct Gardner to allow him to receive his mail from Ms. Maricle, so that he could be prepared for a scheduling conference to be held before Judge Feldman on December 22, 1999. The court file does not indicate what, if any, action Judge Feldman took in response to plaintiff's application. In any event, although plaintiff notified the Court about the alleged destruction of his papers and the alleged tampering with his mail, he never amended the complaint in case number 98–CV–6554 to add those claims.

On October 19, 2000, the parties to case number 98–CV–6554 settled that action. The Stipulation and Order of Settlement [# 17], drafted by counsel for the defendants, and approved and ordered by the undersigned, recited that, in exchange for payment of $3,000, plaintiff was agreeing that, "[a]ny and all claims for damages by plaintiff which are the subject of this action or otherwise arise out of any incident alleged in the complaint are hereby settled." (Settlement Agreement, ¶ 2). The settlement agreement further stated that plaintiff agreed to release

> each of the defendants and any and all current or former employees of the New York State Department of Correctional Services, in his/her/their individual and official capacities, and his/her/their heirs, executors, administrators and assigns, and the State of New York and the New York State Department of Correctional Services, from any and all claims, liabilities and causes of action including but not limited to claims related to or arising out of any alleged violation of plaintiff's constitutional rights, and all other causes of action and claims of liability arising out of the circumstances set forth in the complaint in the above-captioned action.

(*Id.*, ¶ 4).

Defendants now contend that, as part of the settlement agreement in case number 98–CV–6554, plaintiff released them from liability for many of the causes of action asserted in this action. More specifically, they contend that the 1st, 3rd, 4th, 5th, 7th, 25th, 26th, 27th, and 30th causes of action are barred, because in them, plaintiff alleges that they tampered with mail and papers pertaining to case number 98–CV–6554. In other words, they contend that because some of the claims in this action involve alleged tampering with mail and papers from the settled action, they are barred by the settlement agreement. Defendants further contend that they are entitled to summary judgment on the merits as to all of plaintiff's claims.

The Court has thoroughly reviewed the parties' submissions and the entire record in this action.

## ANALYSIS

The standard for granting summary judgment is well established. Summary judgment may not be granted unless "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R.Civ.P. 56(c). A party seeking summary judgment bears the burden of establishing that no genuine issue of material fact exists. *See, Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970). "[T]he movant must make a prima facie showing that the standard for obtaining summary judgment has been satisfied." 11 MOORE's FEDERAL PRACTICE, § 56.11[1][a] (Matthew Bender 3d ed.). "In moving for summary judgment against a party who will bear the ultimate burden of proof at trial, the movant may satisfy this burden by pointing to an absence of evidence to support an essential element of the nonmoving party's claim." *Gummo v. Village of Depew*, 75 F.3d 98, 107 (2d Cir.1996)(*citing Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986)), *cert denied*, 517 U.S. 1190, 116 S.Ct. 1678, 134 L.Ed.2d 780 (1996).

Once that burden has been established, the burden then shifts to the non-moving party to demonstrate "specific facts showing that there is a genuine issue for trial." Fed.R.Civ.P. 56(e); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). To carry this burden, the non-moving party must present evidence sufficient to support a jury verdict in its favor. *Anderson*, 477 U.S. at 249, 106 S.Ct. 2505. Summary judgment is appropriate only where, "after drawing all reasonable inferences in favor of the party against whom summary judgment is sought, no reasonable trier of fact could find in favor of the non-moving party." *Leon v. Murphy*, 988 F.2d 303, 308 (2d Cir.1993). The parties may only carry their respective burdens by producing evidentiary proof in admissible form. FED. R. CIV. P. 56(e). The underlying facts contained in affidavits, attached exhibits, and depositions, must be viewed in the light most favorable to the non-moving party. *U.S. v. Diebold, Inc.*, 369 U.S. 654, 655, 82 S.Ct. 993, 8 L.Ed.2d 176 (1962).

██ A court should read a *pro se* litigant's papers liberally, interpreting them "to raise the strongest arguments that they suggest." *Burgos v. Hopkins*, 14 F.3d 787, 790 (2d Cir.1994). However, when alleging a violation of a civil rights statute, even a *pro se* litigant must make "specific allegations of fact indicating a deprivation of rights, instead of a litany of general conclusions that shock but have no meaning." *Barr v. Abrams*, 810 F.2d 358, 363 (2d Cir.1987).

██ Plaintiff brings this action pursuant to 42 U.S.C. § § 1983 and 1985(3). As to claims for conspiracy pursuant to 42 U.S.C. § 1985, it is well settled that,

> [t]o prevail on a § 1985(3) claim, a plaintiff must prove that the defendants: (1) engaged in a conspiracy; (2) for the purpose of depriving him or her of equal protection, or equal privileges and immunities under the law; (3) acted in furtherance of the conspiracy; (4) deprived the plaintiff of the exercise of any right or privilege of a citizen of the United States; and (5) were motivated by discriminatory animus.

*See New York State Nat'l Org. for Women v. Terry*, 886 F.2d 1339, 1358 (2d Cir.1989), *cert. denied*, 495 U.S. 947, 110 S.Ct. 2206, 109 L.Ed.2d 532 (1990). However, " § 1985(3) may not be construed as a general federal tort law," but rather, "a plaintiff must demonstrate some racial, or

perhaps otherwise class-based, invidiously discriminatory animus behind the conspirators' action." *Id.* (Citations and internal quotations omitted). At the outset, then, plaintiff's conspiracy claims must be dismissed, since he clearly has not alleged that the defendants conspired against him because of any class-based, invidious discriminatory animus.

▮ With regard to claims under 42 U.S.C. § 1983, a plaintiff must allege (1) that the challenged conduct was attributable at least in part to a person acting under color of state law, and (2) that such conduct deprived the plaintiff of a right, privilege, or immunity secured by the Constitution or laws of the United States. *Dwares v. City of New York*, 985 F.2d 94, 98 (2d Cir.1993). To be liable for money damages under 42 U.S.C. § 1983, a defendant must have been personally involved in the alleged constitutional deprivation. *Colon v. Coughlin*, 58 F.3d 865, 873 (2d Cir. 1995). Personal involvement by a supervisory official may be shown by evidence that:

> (1) the defendant participated directly in the alleged constitutional violation, (2) the defendant, after being informed of the violation through a report or appeal, failed to remedy the wrong, (3) the defendant created a policy or custom under which unconstitutional practices occurred, or allowed the continuance of such a policy or custom, (4) the defendant was grossly negligent in supervising subordinates who committed the wrongful acts, or (5) the defendant exhibited deliberate indifference to the rights of inmates by failing to act on

information indicating that unconstitutional acts were occurring. *Id.*(citations omitted). A plaintiff may not rely upon the doctrine of *respondeat superior* to establish supervisory liability under 42 U.S.C. § 1983. *Monell v. New York City Department of Social Services*, 436 U.S. 658, 691–95, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978).

### *Plaintiff's Motion for Summary Judgment*

▮ Plaintiff's motion for summary judgment [# 40] must be denied, because plaintiff has not met the requirements of Fed.R.Civ.P. 56. As noted above, plaintiff, in his motion papers, indicates that he is entitled to summary judgment because "the preponderance of the evidence weighs in [his] favor." (Plaintiff's Declaration, ¶ 6; Plaintiff's Brief, ¶¶ 16, 23, 41, 42). Plaintiff does not claim, and has not demonstrated, that there are no triable issues of fact, or that he is entitled to judgment as a matter of law. Accordingly, his motion for summary judgment is denied.

### *Defendants' Motion for Partial Summary Judgment Based Upon the Settlement in Case Number 98–CV–6554*

▮ Defendants' motion on this ground is also denied. Defendants' allege that many of the claims in this action are barred simply because they relate to the action that plaintiff agreed to settle. However, the settlement agreement does not pertain to the claims in this action, but rather, by its own terms, pertains only to claims arising out of the matters set forth in the complaint in case number 98–CV– 6554.[3] The claims in this lawsuit were not

---

**3.** Ironically, accepting plaintiff's factual statements as true, many of the claims in this action would have been included in an amended complaint in 98–CV–6554, but for alleged interference by the defendants. (As will be discussed further below, however, this alleged interference did not cause plaintiff any actual injury, since he opted not to take advantage of additional opportunities to amend the complaint, and instead agreed to settle the action.)

included in that complaint, and, at best, are merely collateral to the prior case.

Defendants contend that, the *pro se* prisoner plaintiff "obviously knew the instant complaint was inextricably intertwined with 98–CV–6554 when he agreed to the settlement." (Defendants' Memo, p. 2). In essence, defendants' counsel contends that the settlement agreement was intended to settle both 98–CV–6554 and many of the claims in this case. However, defendants' counsel fails to explain why the settlement agreement, which his office drafted, does not mention this action. The Court further notes that, although defendants submitted an affidavit from the attorney who represented the defendants in 98–CV–6554, it does not indicate that the settlement agreement was intended to settle any of the claims in this matter. (*See*, Steinman Affidavit [# 56]). Accordingly, defendants' motion to dismiss the claims as settled is denied.

***Defendants' Motion for Summary Judgment on the Merits***

**1. Plaintiff's Claims Pertaining to Mail and Legal Papers**

Most of plaintiff's claims involve eleven separate incidents, between November 1997 and November 1999, in which defendants allegedly tampered with his mail and/or seized his legal papers. The third, fourth, fifth, seventh,[4] eighth, twenty-fifth, twenty-sixth, and twenty-eighth claims of the complaint allege that defendants tampered with his mail and legal papers in an effort to deny him access to the court, in connection with his prior lawsuit, case number 98–CV–6554. The sixth, twenty-

first, twenty-third, thirtieth, and thirty-second claims allege retaliation. The first, second, and twenty-seventh claims do not expressly allege either denial of court access or retaliation, but instead, allege interference with plaintiff's right to send and receive mail, therefore, the Court will treat those claims as alleging a violation of plaintiff's First Amendment right to send and receive mail.

**a. Denial of Access to the Courts**

It is well settled that,

Prisoners have a First Amendment right of access to the courts, and where there is a deliberate and malicious interference with that right they may seek redress from the court. *Washington v. James*, 782 F.2d 1134, 1138 (2d Cir. 1986). To state a valid § 1983 claim for denial of access to the courts due to interference with an inmate's legal mail, an inmate must allege that a defendant's deliberate and malicious interference actually impeded his access to the court or prejudiced an existing action. *Lewis v. Casey*, 518 U.S. 343, 349, 116 S.Ct. 2174, 135 L.Ed.2d 606 (1996). Therefore, in order to survive a motion to dismiss a plaintiff must allege not only that the defendant's alleged conduct was deliberate and malicious, but also that the defendant's actions resulted in actual injury to the plaintiff such as the dismissal of an otherwise meritorious legal claim. *Id.* at 351, 116 S.Ct. 2174. In other words "the plaintiff must show that a 'non-frivolous legal claim had been frustrated or was being impeded' due to the

---

4. The seventh claim of the complaint alleges that defendants returned a package of mail to the sender without notifying plaintiff, but it is clear from the record, and plaintiff admits, that the papers in claim seven are the same papers referred to in the fifth claim, which were not returned to the sender, but which

were delayed in being delivered to plaintiff, allegedly because defendants wanted to deny plaintiff access to the court in connection with case number 98–CV–6554. (*See*, Gardner Affidavit [# 52], ¶ 56; Moore Affidavit [# 58], ¶ 32).

actions of prison officials." *Warburton v. Underwood,* 2 F.Supp.2d 306, 312 (W.D.N.Y.1998) (*quoting Lewis,* 518 U.S. at 353, 116 S.Ct. 2174); *see also Monsky v. Moraghan,* 127 F.3d 243, 247 (2d Cir.1997). *Cancel v. Goord,* No. 00 CIV 2042 LMM, 2001 WL 303713 at *4 (S.D.N.Y. Mar. 29, 2001). With regard to demonstrating actual injury, a mere "delay in being able to work on one's legal action or communicate with the courts does not rise to the level of a constitutional violation." *Id.* at *5.

Applying the foregoing principles, the Court finds that defendants are entitled to summary judgment on all of the denial of court access claims. First, plaintiff has failed to demonstrate defendants' personal involvement in several of the claims. For example, plaintiff's fourth claim, against defendants McGinnis and Morse[5], alleges that on March 11, 1999, he sent legal work to the prison law library to be photocopied, that the documents were lost, and that when he complained to McGinnis and Morse about the loss of his papers, they told him that "accidents happen," and "I hope you don't think I had anything to do with that." McGinnis and Morse deny making any such statements. (McGinnis Affidavit, ¶ 51, Morse Affidavit, ¶ 14). However, even assuming, as the Court must, that they did make those statements, plaintiff has still failed to show that they had anything to do with the disappearance of his papers. Similarly, in his eighth claim, plaintiff alleges that, on September 15, 1999, he received a package of documents in response to a request under the Freedom of Information Law (FOIL), from which certain pages were missing. Plaintiff further alleges that someone altered his "package room sign sheet," and

that the foregoing acts were committed by McGinnis, Morse, and Gardner, all of whom deny the allegation. In fact, Gardner indicates that, although she was the Senior Mail Clerk, the mail room was not involved with the processing of FOIL requests or the processing of packages. (Gardner Affidavit, ¶ 57–60). Rather, she indicates that packages were handled "by the package room, a unit which is entirely separate from the Mail Room." (*Id.,* ¶ 27). Further, she alleges that she had "nothing to do with how packages [were] handled." (*Id.*). In response, plaintiff alleges only that, "[d]efendant Gardner received plaintiff's package on May 3, 1999, as U.S. Mail, Sr. Mail Clerk responsible for processing to Package Room." (Plaintiff's Affidavit [# 69], ¶ 58). However, apart from mere speculation, plaintiff has not come forward with any evidence that McGinnis or Morse had anything to do with the alleged tampering with his FOIL request, and his claim against Gardner appears to rest solely on a theory of respondeat superior liability, which as noted, is insufficient under Section 1983.

As for plaintiff's third claim, it is clear that the particular document was confiscated because plaintiff had violated the prison's directives. Plaintiff alleges that on March 5, 1999, defendant Morse directed Cleveland to file a false misbehavior report against him, which Cleveland did. This misbehavior report alleged that plaintiff had violated the inmate correspondence regulations by sending out mail using the return address of another inmate. Using another inmate's return address, a practice known as "kiting," is prohibited by DOCS Directive 4422, §§ III(B)(12) & (19). Plaintiff has presented no evidentiary proof in admissible form to suggest that

---

**5.** The fourth claim of the complaint actually only purports to allege a cause of action against McGinnis, but since it also refers to

Morse, the Court, liberally construing the pro se complaint, will treat it as a claim against both McGinnis and Morse.

Morse directed Cleveland to file the misbehavior report. Moreover, plaintiff admits that he sent the mail out using another inmate's return address, although he attempts to justify his actions on the grounds that he feared corrections staff might try to destroy his legal work. (Plaintiff's Affidavit [# 64], ¶ 29). Therefore, it is clear that Cleveland's misbehavior report was warranted.

In his twenty-sixth claim, plaintiff alleges that the prison library lost certain documents which he had sent there to be photocopied, and he blames defendants Murphy and Shaw for failing to assist him in finding the papers. However, he has produced no proof that either Murphy or Shaw actually destroyed the documents or failed to search for them. Rather, his claim against Murphy appears to be based upon respondeat superior ("Defendant Murphy is Supervisor and in charge of safeguarding our Legal documents." (Complaint [# 1], ¶ 178)), and he admits that he has no personal knowledge regarding Shaw's actions ("I can't verify that he did or did not [attempt to locate the documents.] I was not there to give honest testimony to his actions. Based on past performance I can only allege nothing was done." (Plaintiff's Second Affidavit [# 78], ¶ 71)).

In addition, plaintiff has not demonstrated that he suffered any actual injury as a result of the alleged tampering with his mail and legal documents. For example, in his third claim, plaintiff alleges that on February 25, 1999, defendants Gardner and Cleveland confiscated a proposed amended complaint in his case number 98–CV–6554, "[r]esulting in the amended complaint not reaching the courts as it had to be typed and copied, Plaintiff lost (8) Defendants as a result." (Complaint, ¶ 17). As noted above, the proposed amended complaint was properly seized because

plaintiff attempted to mail it using another inmate's return address. Even assuming, however, that the confiscation had been improper, the following chronology demonstrates that plaintiff suffered no actual injury. Plaintiff admits that he learned of the confiscation of his proposed amended complaint as early as March 16, 1999. (*Id.*, ¶ 14). Subsequently, on April 9, 1999, the Court signed a Decision and Order [# 3], which, *inter alia,* gave plaintiff until May 14, 1999, to file an amended complaint. In his fifth claim, plaintiff alleges that he attempted to comply with this deadline for filing an amended complaint, and that on April 30, 1999, Ruth Moore, who is apparently his mother, typed and sent him three copies of an amended complaint. Plaintiff further alleges that he notified Gardner in advance that he needed the package in order to meet a court-ordered deadline, but Gardner "forwarded mail to the facility package room where it continued to sit on a shelf until June 15, 1999, one month past court ordered date." (Complaint, ¶¶ 23–24). As to that, it is undisputed that the papers were in a box, as opposed to an envelope, and it is also undisputed that Gardner was not involved with the operation of the package room. However, plaintiff also fails to mention that he was later given additional time to file a motion to amend his complaint. *See,* 98–CV–6554, Scheduling Order [# 11]: ("All motions to join other parties or to amend pleadings shall be filed by **March 31, 2000.**"). Plaintiff never filed any such motion to amend the complaint, nor does he allege that he attempted to do so. Instead, on February 28, 2000, he commenced this action. Thus, at the time plaintiff commenced this action, he still had a month in which to file a motion to amend the pleadings in his other case. Subsequently, as previously indicated, he settled the action for the sum of three thousand dollars. (*See,* 98–CV–6554, Stip-

ulation and Order of Settlement [# 17]). In light of all the foregoing, the Court finds that plaintiff has not shown actual injury.

Similarly, in his twenty-fifth claim, plaintiff alleges that on September 13, 1999, he attempted to send 452 pages of legal mail to "Attorney A. Plasse," apparently in connection with case number 98–CV–6554, in two sealed envelopes, and that, thereafter, Gardner twice refused to mail the envelopes, and returned them to him having been opened, and that the second time the envelopes were returned, papers were missing. (Complaint, ¶¶ 161–62). However, apart from delaying his ability to communicate with the attorney, plaintiff has not explained how this alleged destruction caused him to suffer any actual injury in connection with 98–CV–6554, or any other law suit.

Finally, plaintiff's thirtieth claim alleges that Gardner returned the affidavit of another inmate which Maricle had mailed to plaintiff for use at a "conference" in case number 98–CV–65554. Plaintiff indicates that he initially possessed the original of the affidavit, but mailed it out to Maricle, so that she could type a copy of it and return both the original and the copy to him. (Plaintiff's Affidavit [# 69], ¶¶ 114, 116). When Maricle attempted to mail the original and a typed copy back to him, it was confiscated as third-party mail, since the affidavit was from another inmate. As discussed further below, it appears that this affidavit was properly returned as prohibited third-party mail. Moreover, plaintiff has not explained how the returning of the affidavit caused him to suf-

fer any actual injury. As to that, plaintiff was certainly not required to send the original of the affidavit out to be re-typed by Maricle, thus there was nothing to prevent him from submitting the affidavit directly to the Court.

■ The Court has considered all of plaintiff's denial of court access claims, and finds that he has failed to raise triable issues of fact either as to the defendants' personal involvement or as to the required element of actual injury. Plaintiff has not demonstrated that the alleged acts of interference resulted in him receiving a smaller settlement amount that he would have otherwise, or that they otherwise affected the outcome of the action. Rather, the record indicates that despite any alleged interference from defendants, plaintiff was fully able to prosecute case number 98–CV–6554 and to resolve it on terms that were satisfactory to him. Therefore, he has not shown that he suffered any actual injury. Consequently, all of the claims alleging denial of court access (3,5,7,8,25,26,28,30) are dismissed.[6] However, although the twenty-fifth and thirtieth claims must be dismissed insofar as they claim denial of court access, the Court will also consider them below, insofar as they can also be construed as stating, respectively, a claim for retaliation and a claim for violation of plaintiff's First Amendment right to send and receive mail.

### b. Retaliation Claims

■ The Second Circuit Court of Appeals has set forth the applicable law for retaliation claims as follows:

---

**6.** It may be that, in his twenty-fifth and twenty-eighth claims, plaintiff is actually alleging that defendants tried to deny him court access not in connection with case number 98–CV–6554, but in connection with the instant case. To the extent that may be the case, those claims must nonetheless be dismissed, since

plaintiff has still not demonstrated any actual injury. Rather, it is clear that plaintiff has been fully able to prosecute this action, and in so doing has managed to file more documents and exhibits, many of them repetitive, than any other litigant in the Court's recent memory.

In *Mount Healthy Sch. Dist. v. Doyle,* 429 U.S. 274, 287, 97 S.Ct. 568, 576, 50 L.Ed.2d 471 (1977), the Supreme Court established the standard for a § 1983 claim that the state actor retaliated against a plaintiff for exercising a constitutional right. The plaintiff bears the burden of showing that the conduct at issue was constitutionally protected and that the protected conduct was a substantial or motivating factor in the prison officials' decision to discipline the plaintiff. *Id.* If the plaintiff carries that burden, the defendants must show by a preponderance of the evidence that they would have disciplined the plaintiff "even in the absence of the protected conduct." *Id.* Thus, if taken for both proper and improper reasons, state action may be upheld if the action would have been taken based on the proper reasons alone. *Lowrance,* 20 F.3d at 535 (citing *Mount Healthy,* 429 U.S. at 287, 97 S.Ct. at 576; *Sher v. Coughlin,* 739 F.2d 77, 82 (2d Cir.1984)) (affirming summary judgment dismissal of prisoner's § 1983 retaliation claim). A finding of sufficient permissible reasons to justify state action is "readily drawn in the context of prison administration where we have been cautioned to recognize that prison officials have broad administrative and discretionary authority." *Lowrance,* 20 F.3d at 535 (quotation marks omitted). Retaliation claims by prisoners are "prone to abuse" since prisoners can claim retaliation for every decision they dislike. *Flaherty v. Coughlin,* 713 F.2d 10, 13 (2d Cir.1983). A complaint of retaliation that is "wholly conclusory" can be dismissed on the pleadings alone. *Id.*

In short, [an inmate's] claim will not survive summary judgment under the *Mount Healthy* test if he does not meet the burden of demonstrating two genuine issues of material fact: (1) that the disciplined conduct was constitutionally protected, and (2) that his punishment was motivated, in whole or in part, by his conduct—in other words, that the prison officials' actions were substantially improper retaliation. Assuming [the inmate] meets his burden, his claim will still not survive summary judgment under *Mount Healthy* if the defendants meet their burden of showing that there is no genuine issue as to the fact that [he] would have received the same punishment even if they had not been improperly motivated.

*Graham v. Henderson,* 89 F.3d 75, 79–80 (2d Cir.1996). Filing an inmate grievance is constitutionally protected activity. *Id.* at 80 (citation omitted).

In his sixth claim, plaintiff alleges that, in May of 1999, Gardner twice delayed his mailing of an order to a gift catalog, in retaliation for unspecified complaints he made against her. More specifically, he alleges that on April 29, 1999, he followed the proper prison procedures for mailing out a catalog order, and in that regard, he has submitted copies of his disbursement requests, which were approved by a corrections officer. (*See,* Plaintiff's Exhausted Remedies & Exhibits, Sixth Claim). On April 30, 1999, the mail room returned his order, with a notification, indicating that he had failed to use separate disbursement forms for his order and for his postage. The notification also contained a handwritten notation, "Disbursement was included for order. Also second disbursement for postage for both letters." Plaintiff indicates that Gardner returned the mail to him because he attempted to use one disbursement form to mail two items. (Plaintiff's Affidavit [# 69], ¶ 51, Exhibit U, dated April 30, 1999). However, he also indicates that inmates may use one form 2706 to mail multiple letters. (*Id.,* ¶ 69, Exhibit W). Subsequently, on May

13, 1999, plaintiff again attempted to mail his catalog order, using separate disbursement forms for the order and for the postage, and putting only one postage request on the latter form. However, although a corrections officer again approved the forms, the mail room returned the mail without explanation.

Gardner's affidavit in support of summary judgment does not purport to say exactly why the mail was twice returned, but notes instead that "[t]here is no record in the mail room files showing that any mail was returned by the mailroom to plaintiff during the time period in question in this claim." (Gardner Affidavit [# 52], ¶ 51). However, she generally denies that she ever tampered with plaintiff's mail or retaliated against him. (*Id.*, ¶ ¶ 93–96).

 Considering all the foregoing, the Court finds, first, that plaintiff has not demonstrated that Gardner was personally involved in the decision to return the catalog order. Although plaintiff clearly indicates that the mailing was returned to him by the mail room, that fact that Gardner ran the mail room would not alone subject her to liability. Plaintiff's belief that Gardner has respondeat superior liability is indicated by his affidavit [# 69], in which he states: "Plaintiff sent mail to mailroom for mailing. Plaintiff told to resubmit by correspondence, first mailing April 29, 1999. *Mail clerk initialed for DG.* claiming request denied, two postage may not be on from 2706. Exhibit U." (Plaintiff's Affidavit [# 69], ¶ 51, Exhibit U)(emphasis added). Assuming that "DG" refers to the defendant, Deane Gardner, plaintiff's affidavit indicates his belief that some other, unidentified, mail clerk signed on behalf of Gardner.

 Even assuming, however, that plaintiff had shown that Gardner personally returned his catalog order, his allegations regarding retaliation are merely con-clusory. *See, Boddie v. Schnieder,* 105 F.3d 857, 862 (2d Cir.1997)(noting that "unsupported, speculative, and conclusory" claims of retaliation may be dismissed.) (citations omitted). In his complaint, plaintiff merely alleges that Gardner "delay[ed] mail out of retaliation for Plaintiff's complaints." (Complaint [# 1], ¶ 28). Plaintiff has not otherwise explained what specific "complaints" of his are claimed to be protected activity, nor has he provided any evidentiary proof in admissible form demonstrating a causal link between such "complaints" and the returning of his catalog order. Accordingly, Gardner is entitled to summary judgment as to the sixth claim.

Plaintiff's twenty-first claim alleges two separate incidents of retaliation by Gardner. First, he alleges that, on June 26, 1999, Maricle sent him a letter and a money order, and that Gardner held the letter for a week and then returned it to Maricle without notifying him. Then, he alleges that on July 1, 1999, he attempted to mail a letter, and Gardner held the letter for eleven days before returning it to him. He contends that these actions were in retaliation for his having filed a grievance against Gardner for allegedly delaying his mail.

With regard to the first letter from Maricle, Gardner indicates that she returned the letter because it contained "coding," in violation of DOCS Directive 4422, and that any delay in the return was probably because July 5, 1999 was a business holiday. (Gardner Affidavit ¶ ¶ 61–63). The record contains a copy of the memo which Gardner sent to Maricle, which states, in relevant part:

> In accordance with [DOCS] correspondence policy and procedure, the enclosed is being returned to you in its entirety as it is unacceptable correspondence for

one or more of the following reasons and *will not* be delivered to the inmate: *The letter enclosed contains "coding" and is considered a breach of security.*

(Plaintiff's Exhausted Remedies & Exhibits, Twenty-first claim). The letter which allegedly contained coding is not in the record.[7] Plaintiff filed an inmate grievance against Gardner, which was denied, and in response to his appeal, the Central Office Review Committee ("CORC") indicated that the coding in the letter appeared to be "third party mail:" "The contents [of the letter] included pages consisting of an arbitrary system of letters, and it was not possible to determine who had written these pages." (CORC decision dated September 8, 1999). Accordingly, CORC indicated that it was appropriate to return the letter without first notifying plaintiff, pursuant to Directive 4422, sec. III(G)(4)(a), which states:

> Third party mail—defined as correspondence from a party who is not identified as the sender in the return address. The facility staff shall return the entire correspondence to the sender with a letter explaining that third-party mail is considered contraband, is against Department rules, and therefore will not be delivered to the inmate.

(Plaintiff's Exhausted Remedies & Exhibits, Twenty-first claim)(emphasis added).

Plaintiff's main complaint seems to be that he was denied "due process," that is, he was not given notice and an opportunity to be heard before the mail was returned to Maricle. His claim therefore depends upon a technical distinction in Directive 4422, since, pursuant to that directive, when an inmate is sent third-party mail, the facility is entitled to simply return the entire correspondence to the sender, but

when the inmate is sent "unauthorized items," he is notified and is given the option of either having the items returned to the sender, donated, or destroyed at his cost. (Directive 4422, Sections G(4)(a) & (b)). Plaintiff acknowledges that June 26, 1999, was a Sunday, and that July 5, 1999, was a holiday. (Plaintiff's Affidavit [# 69], ¶¶ 61, 63).

■ As to the first of these incidents, the Court finds that Gardner is entitled to summary judgment. It is undisputed that prison officials may inspect incoming correspondence for contraband. See, Directive 4422, Section G(1). Moreover, it does not appear that Gardner did anything improper by treating the mail as third-party mail, and returning it to the sender. Nor has plaintiff demonstrated that Gardner unreasonably delayed returning the letter.

■ With regard to the letter which plaintiff attempted to mail on July 1, 1999, which was returned eleven days later for insufficient funds, defendants have submitted a grievance which plaintiff wrote on July 15, 1999, in which he stated, "If she [Gardner] had not held it until 7/12 (after Commissary), *I would have had sufficient funds.*" (McGinnis Affidavit [# 53], Exhibit N)(emphasis added). Clearly, this indicates that, in fact, plaintiff did not have sufficient funds to mail the letter. Moreover, as to his claim that Gardner intentionally delayed processing his letter, she has stated, in her affidavit, that plaintiff's letter was processed and sent on to the Business Office, whose function it was to determine whether or not he had sufficient funds. Moreover, pursuant to DOCS Directive 2798(III)(A)(b), the Business Office has at least ten days in which to process

---

7. As for whether or not the letter contained coding, plaintiff indicates: "On July 7, 1999 a letter containing coding, along with a money order, returned per directive 4422." (*Id.*, ¶ 62).

inmate disbursement requests. (McGinnis Affidavit [# 53], Exhibit V). Accordingly, she indicates that she was not responsible either for the alleged delay or for the letter being returned for insufficient funds. (Gardner Affidavit [# 52], ¶¶ 71–76). The Court also notes that July 3rd—4th, 1999, was a weekend, and that July 5th was a federal holiday. As to this claim, the Court finds that plaintiff has failed to demonstrate either that his outgoing mail was unreasonably delayed, or that Gardner had anything to do with his letter being returned for insufficient funds. Accordingly, Gardner is entitled to summary judgment with regard to the 21st claim, which is dismissed.

For his twenty-third claim, plaintiff alleges that, on June 23 and June 27, 1999, he attempted to mail letters, which Gardner held until June 30th before mailing. Plaintiff alleges that this delay was retaliatory, although he again does not identify the specific protected act for which Gardner was allegedly retaliating. Gardner denies that she delayed plaintiff's mail, and notes that, as discussed above, when inmates want to send a letter, they need to make a disbursement request, which is forwarded to the prison's Business Office for processing, and that, under DOCS Directive 2798, the Business Office has ten days to process such requests. (Gardner Affidavit, ¶¶ 64–72). Plaintiff admits that the Business Office has ten days to process such requests. (Plaintiff's Affidavit [# 70], ¶ 86). Moreover, Gardner noted that June 23, 1997 was a Wednesday, and June 27, 1999 was a Sunday. Therefore, the former letter was "delayed" 5 business days, and the latter letter just two business days before they were mailed.

The Court again finds that plaintiff has failed to raise a triable issue of fact as to whether or not his outgoing mail was unreasonably delayed, and whether or not

Gardner had anything to do with such delay. Therefore, she is entitled to summary judgment on the twenty-third claim, which is dismissed.

For his thirtieth claim, also discussed above, plaintiff alleges that on November 17, 1999, Maricle mailed him a letter containing an affidavit from another inmate. Plaintiff alleges that defendant Gardner received the letter on or about November 19, 1999, then returned it to Maricle on November 24th, as prohibited third-party mail. Plaintiff has submitted a copy of the memo which Gardner sent to Maricle, which does indicate that the mail was being returned as third-party mail. (Plaintiff's Exhausted Remedies & Exhibits, Thirtieth claim).

Gardner indicates that she had no personal involvement in the decision to return the mail to Maricle, however, she agrees that if the envelope contained an affidavit from another inmate, it was prohibited third-party mail under Directive 4422. (Gardner Affidavit, ¶¶ 108–120, Exhibit N). In response, plaintiff agrees that Gardner was not involved in returning the mail (*See,* Moore Affidavit [# 69], ¶¶ 108–11), but he contends that she is nonetheless liable, since, as Senior Mail Clerk, she is "in charge of making sure staff follow policy and procedure." (*Id.* at ¶ 120).

The Court finds that Gardner is entitled to summary judgment, because plaintiff has not demonstrated her personal involvement, and, as noted, there is no respondeat superior liability under Section 1983. Moreover, the mail in question does fit the description of third-party mail. Gardner is therefore entitled to summary judgment on the thirtieth claim, which is dismissed.

Finally, for his thirty-second claim, in which he names defendant Murphy, plaintiff alleges that on December 5,

1999, he sent documents, pertaining to the instant lawsuit, to the prison library to be photocopied.[8] Subsequently, he received back a memo from Murphy, instructing him to explain why those documents contained a misbehavior report belonging to another inmate. In an affidavit, Murphy indicates that, pursuant to prison regulations, plaintiff was not entitled to possess the other inmate's misbehavior report, and that accordingly, he sent the memo to plaintiff telling him to explain how he came to possess the report, or else would issue plaintiff a misbehavior report. (Murphy Affidavit, ¶¶ 8–14). Murphy subsequently did write a misbehavior report, in which he alleged that plaintiff never responded to his memo. Plaintiff, however, contends that he did give Murphy a written explanation, explaining that he had been authorized to possess the other inmate's papers by a Disciplinary Hearing Officer. (*Id.*, ¶ 14, Exhibit D). Plaintiff also alleges that, prior to his commencing a lawsuit against Murphy, Murphy had previously photocopied the same document but had not questioned plaintiff about it. Moreover, the alleged retaliation occurred shortly after the date Murphy would have learned that plaintiff was naming him as a defendant in the instant action. Based upon the foregoing, the Court finds that, as to the thirty-second claim, plaintiff has at least demonstrated a triable issue of fact as to whether or not Murphy retaliated against him. Therefore, the thirty-second claim against Murphy may go forward.

### c. First Amendment Right to Send and Receive Mail

■ Plaintiff's first, second, twenty-fifth, and twenty-seventh claims all pertain to alleged tampering with his mail. It is clear that "[p]rison inmates have a First Amendment right to the free flow of both incoming and outgoing mail," and that "[p]rison restrictions on inmate mail must be reasonably related to prison interests in security." *Hudson v. Greiner,* No. 99 CIV. 12339(LAP), 2000 WL 1838324 at *5 (S.D.N.Y. Dec. 13, 2000) (citations omitted); *see also, Wolfish v. Levi,* 573 F.2d 118, 129–30 (2d Cir.1978), *rev'd on other grounds, sub nom. Bell v. Wolfish,* 441 U.S. 520, 99 S.Ct. 1861, 60 L.Ed.2d 447 (1979). Although prisoners' First Amendment mail claims are often intertwined with claims for denial of court access, they may exist separately.

■ With regard to outgoing legal mail, "prison officials can only open an inmate's outgoing legal mail if there is a 'rational justification' for doing so." *Cancel v. Goord,* No. 00 CIV 2042 LMM, 2001 WL 303713 at * 7 (*citing Davidson v. Scully,* 694 F.2d 50, 54 (2d Cir.1982)). Moreover, DOCS Directive 4421 states that "[o]utgoing privileged correspondence may be sealed by the inmate, and such correspondence shall not be opened, inspected, or read without express written authorization from the facility superintendent." As for incoming legal mail, it is undisputed that such mail "shall not be opened outside the presence of the inmate to whom it is addressed; and shall not be read without express written authorization from the facility superintendent." DOCS Directive 4421, Section III(B)(1). Although a single, isolated incident may fail to state a constitutional claim, multiple occurrences of prison officials opening an inmate's privileged mail may give rise to a Section 1983 action. *Washington v. James,* 782 F.2d 1134, 1139 (2d Cir.1986).

---

**8.** Although this action was not commenced until February 28, 2000, it appears that the documents plaintiff sent to be copied were part of a draft complaint in this action, which included the twenty-sixth claim against Murphy.

At the outset, the Court notes that all of plaintiff's mail claims are against the backdrop of his belief that he was the subject of an unauthorized "mail watch," instituted by defendant Superintendent McGinnis. Mail watches may only be imposed under certain circumstances:

> Incoming general correspondence . . . will not be read unless there is evidence that [it] may contain one or more of the following: a. plans for sending contraband . . . b. plans for criminal activity . . . and c. information which, if communicated, would create a clear and present danger. . . .
>
> Written authorization from the facility Superintendent to read incoming mail must be placed in the inmate's file specifying the reasons such action is considered necessary and whether all mail or certain correspondence shall be read. . . .

(DOCS Directive 4422, Section G(5) & (6); see also, Section (B)(8): "Outgoing correspondence shall not be opened, inspected, or read without express written authorization from the facility Superintendent."). As proof that such a mail watch existed, he has submitted a memo which his prison counselor, Patricia Klatt, sent to him, after he asked her to check on the status of his mail. The memo, dated April 30, 1998, states as follows: "Mr. Moore: I spoke with Mrs. Gardner in Correspondence. She advised me that your mail is being checked by the Superintendent currently and as soon as she has a response from him you will be hearing from her." (Plaintiff's Affidavit [# 68], Exhibit B). Plaintiff contends that this memo demonstrates that the mail watch existed and that Gardner and McGinnis had an ongoing practice of improperly checking his mail. Klatt contends that her memo only pertained to one letter about which plaintiff had asked her, and that there was no mail watch.

Plaintiff, however, maintains that he had asked Klatt to check on the status of several pieces of mail, and that her memo indicates that McGinnis was checking all of his mail, which would have been prohibited, since there was no written authorization from McGinnis for a mail watch. (Klatt Affidavit [# 49], ¶ 5; Plaintiff's Affidavit [# 68] ).

Turning to the specific claims of mail interference, plaintiff's first claim involves a piece of mail, which he contends was properly labeled as confidential legal correspondence, that he attempted to mail, and which Gardner and McGinnis opened and returned to him. He claims that on November 20, 1997, he attempted to send a letter to an F.B.I. agent, Robert J. Wick, Jr., concerning alleged constitutional violations at the prison, but that Gardner, with McGinnis' permission and agreement, opened the letter, "pryed into its contents," and then returned it to plaintiff. Plaintiff indicates that Wick had previously come to the prison to interview him as part of an investigation into alleged civil rights violations at the prison. The record indicates that Gardner sent plaintiff's letter to McGinnis, asking whether or not the letter should be classified as legal mail, and that McGinnis classified it as non-legal mail, whereupon it was opened and returned to plaintiff. Plaintiff alleges that Gardner and McGinnis conspired to open and read this mail, because they feared what plaintiff might have been communicating to the F.B.I.

McGinnis indicates that he never tampered with or destroyed plaintiff's mail, and that he is not aware of any of his staff doing so. (McGinnis Affidavit, ¶ 88). Moreover, he indicates that, "[e]very time plaintiff's mail was opened, returned, or otherwise interfered with, it was due to a violation of the correspondence regulations." (Id., ¶ 94). Gardner also indicates

that the letter was opened and returned because plaintiff did not follow the Department of Correctional Services' Directive 4421 regarding privileged correspondence. Section(III)(B)(10) of that directive requires that all mail include the addressee's full address, and that if it does not, the mail is to be opened to ensure that it is returned to the appropriate inmate. Gardner indicates that plaintiff violated this rule, since his letter was addressed only to "Robert J. Wick, Jr., Special Agent, P.O. Box 150, Elmira N.Y. 14901," from which it was not possible to determine that Wick was a governmental or public official. (Gardner Affidavit, ¶ 4–11, Exhibit A). Plaintiff, however, maintains that he did include the term "F.B.I." on the envelope, and that someone, presumably Gardner, deleted that term from the envelope. (Plaintiff's Affidavit [# 70], ¶ 24; see also, Plaintiff's Affidavit [# 69], ¶ 11). Plaintiff also indicates that McGinnis knew that Wick was an F.B.I. agent, since he had been to the prison and signed in on the prison's log book. Considering all of the foregoing, the Court finds that there are triable issues of fact surrounding the first claim, therefore, defendants' motion for summary judgment as to that claim is denied.

■ The twenty-fifth claim, as noted above, indicates that on September 13, 1999, plaintiff attempted to mail 452 pages of documents pertaining to a Section 1983 action to an attorney named A. Plasse. Plaintiff sent the documents to be mailed in two sealed envelopes. The following day, Gardner returned the envelopes to plaintiff, claiming that his postage disbursement form was incomplete, because it had not been signed by a corrections officer. Plaintiff alleges Gardner had no reason to return the mail, since his disbursement form had been signed by a corrections officer. Moreover, he contends

that when he received the envelopes back, they had been opened and stapled shut. Plaintiff again attempted to mail the envelopes, using new disbursement forms signed by a corrections officer, but Gardner again returned the envelopes. Plaintiff contends that the envelopes had again been opened, and that 372 pages of documents were missing. (Complaint, ¶¶ 161–66). In support of the motion for summary judgment, Gardner contends that on both occasions, the envelopes were returned, unopened, because plaintiff had not followed the proper mailing procedures. (Gardner Affidavit [# 52], ¶¶ 77–84). Based upon the foregoing, the Court finds that there are triable issues of fact, and defendants' motion for summary judgment is denied as to the twenty-fifth claim, with regard to the claim for mail interference.

■ Plaintiff's twenty-seventh claim pertains to a letter sent to him by the United States Department of Justice, which clearly qualifies as legal mail. Plaintiff contends that the letter was opened before he received it, because the tape re-sealing the envelope was placed over a stamp indicating the date the letter had been received at the prison. Plaintiff also alleges that the corrections officer who brought the envelope to his cell indicated that he had received it from Gardner. Gardner, however, denies that she opened plaintiff's legal mail, and notes that, pursuant to DOCS policy, legal mail is delivered to the inmate by the Legal Mail Officer, who opens the mail in the inmate's presence to insure that it complies with DOCS directives, and that the inmate then must sign a receipt. Gardner states that the receipt which plaintiff signed does not indicate that the mail had been opened. (Gardner Affidavit, ¶¶ 85–96, Exhibit I). Clearly, there is a triable issue of fact as to whether or not this piece

of legal mail was opened. Accordingly, defendants' motion for summary judgment as to the twenty-seventh claim is denied.

Finally, in his second claim, plaintiff alleges that in April of 1998, Gardner, upon McGinnis' orders, refused to deliver sixteen pieces of mail addressed to him, and instead, returned them to the sender, without justification. It is well-settled that "[p]rison regulations or practices affecting a prisoner's receipt of non-legal mail must be reasonably related to legitimate penological interest." *Cancel*, 2001 WL at 303713 *6 (Citations and internal quotations omitted). Pursuant to § 27 of Southport's Orientation Manual, inmates are only permitted to receive up to five photocopies in the mail. Moreover, inmates are not permitted to possess posters, defined as being larger than 14″ × 18″. (Gardner Affidavit, Exhibit C).

In support of the summary judgment motion, Gardner states: "The 16 letters that plaintiff refers to in this claim were 16 oversize envelopes, each containing more than 5 photocopies.... The photocopies were larger than poster-size, which is not allowed." (Gardner Affidavit [# 52], ¶¶ 21–22). Plaintiff, however, maintains: "Plaintiff's 16 letters were not oversize, they were standard manilla envelopes smaller than the legal envelopes the facility gives prisoners.... [The envelopes] contained 6 pages, five copies and none notebook page letter." (Moore Affidavit [# 69], ¶ 21). Therefore, plaintiff asserts that each of the envelopes contained only five copies. Moreover, he indicates that Gardner previously stated, in a memo to him, that only one of the envelopes contained a poster-sized photocopy. (*Id.*, ¶ 22 & Exhibit F).

▆ Based on the foregoing, the Court finds that there are triable issues of fact as to whether or not plaintiff's sixteen pieces of mail were properly returned. For ex-

ample, it is unclear whether the prison's limit on five photocopies is intended to limit the receipt to five copies per day, or five copies per letter. Moreover, even if Gardner's affidavit is true, it does not appear that she complied with the prison's regulations, because she returned all of the mail, while the SHU manual indicates only that, "*excess of 5* must be sent home or destroyed." (McGinnis Affidavit [# 53], Exhibit A)(Emphasis added). While a failure to follow prison regulations does not of itself state a constitutional claim, in the context of the instant action is does lend some weight to plaintiff's claim. Therefore summary judgment is denied as to the second claim.

### Plaintiff's Claims Pertaining to His Conditions of Confinement

▆ In his twenty-ninth claim, plaintiff complains that defendants McGinnis, Morse, Cleveland, and Shaw, acting with deliberate indifference, deprived him of his bed linens during cold weather. The law regarding Eighth Amendment claims as to conditions of confinement is well settled:

While the Eighth Amendment's prohibition against cruel and unusual punishment does not mandate comfortable prisons, the conditions of confinement must be at least humane. In order to establish a violation of his Eighth Amendment rights, an inmate must show (1) a deprivation that is objectively, sufficiently serious that he was denied the minimal civilized measure of life's necessities, and (2) a sufficiently culpable state of mind on the part of the defendant official, such as deliberate indifference to inmate health or safety. A prison official may be found to have had a sufficiently culpable state of mind if he participated directly in the alleged event, or learned of the inmate's complaint and failed to remedy it, or created

or permitted a policy that harmed the inmate, or acted with gross negligence in managing subordinates.

*Gaston v. Coughlin,* 249 F.3d 156, 164 (2d Cir.2001) (citations and internal quotations omitted). As to the objective prong of the analysis set forth above, "an Eighth Amendment claim may be established by proof that the inmate was subjected for a prolonged period to bitter cold." *Id.* (*citing Corselli v. Coughlin,* 842 F.2d 23 (2d Cir.1988)).

In *Gaston,* the plaintiff alleged that there were numerous broken windows in his cell block, and that he "was subject to temperatures near or well below freezing for a five-month period." *Id.* at 165. The Second Circuit held that those facts set forth a "colorable Eighth Amendment claim." *Id.* Similarly, in *Corselli,* an inmate alleged that

> he was deliberately exposed to bitterly cold temperatures for approximately three months in the fall and winter of 1983–84 when the large window frames in his cell block were empty and corrections officers made things worse by tearing down plastic sheeting partially covering the frames. [The plaintiff] submitted to the district court climate data charts that demonstrated that temperatures in the Sing Sing environs were in the subfreezing range for most of that period. [The plaintiff] further asserted at his deposition that 'it was so cold ... there was ice in the toilet bowl.'

842 F.2d at 27. In response, the defendants indicated that they had given the inmates an additional blanket. *Id.* The Second Circuit, reversing a grant of summary judgment for the defendants, held that the issue of whether or not plaintiff had established an 8th Amendment violation had to "be resolved by the trier of fact." *Id.* Also, in *Wright v. McMann,* 387 F.2d 519, 521 (2d Cir.1967), the Second

Circuit found an 8th Amendment violation where the inmate alleged, *inter alia,* that "the windows in front of his confinement cell were opened wide throughout the evening and night hours of each day during subfreezing temperatures causing plaintiff to be exposed to the cold air and winter weather without clothing or other means of protecting himself or to escape the detrimental effects thereof." *Id.; see also, Maguire v. Coughlin,* 901 F.Supp. 101, 105 (N.D.N.Y.1995)(Denying summary judgment where the plaintiff alleged that he was confined in a cold cell without bed linens.); *but see, Grant v. Riley,* No. 89 Civ. 0359(MBM), 1993 WL 485600 at *4 (S.D.N.Y. Nov. 24, 1993)(Wherein plaintiff alleged that he was kept in a cold cell with a broken window for three days, nine of those hours without "coat, bedding, or blankets," but district court granted summary judgment for defendants, noting that, "plaintiff does not claim that any defendant deliberately subjected him to the cold, and has alleged only a three-day period of exposure.").

In his Complaint, plaintiff alleges that on Friday, November 26, 1999, he placed four bed sheets into the laundry, and that later that day, he received back only one full sheet and a half of another torn sheet. He also alleges that "the weather was ten to twelve degrees and [his] window had weather strips missing allowing cold air into [the] cell." (Complaint, ¶ 194). In addition, plaintiff had his usual clothing, as well as one summer-weight blanket. (Plaintiff's Response [# 58], ¶ 91). He alleges that over the following three weeks, he notified Cleveland, Morse, and Shaw, that the sheets were missing and that his cell was cold, and offered to pay for new sheets, but that they did not provide him with additional sheets. He also indicates that he wrote two letters to Superintendent McGinnis regarding the situation. In

one of the letters to McGinnis, plaintiff wrote, "It is still quite cold and I'm not able to sleep like this." (Plaintiff's letter to Supt. McGinnis dated December 5, 1999). He indicates that he was finally given two new sheets on December 14, 1999.

In support of the summary judgment motion, Morse indicates that he had nothing to do with the laundry at Southport, and denies that plaintiff ever complained to him about missing sheets or a cold cell. (Morse Affidavit, ¶ 26). Cleveland does not dispute that plaintiff asked for new sheets, but he does deny that plaintiff ever complained to him about his cell being cold or drafty, and indicates that the temperature in plaintiff's cell was kept at 68 to 72 degrees Fahrenheit. (Cleveland Affidavit ¶¶ 15–17, 22). As to the temperature, however, plaintiff indicates that "temperatures in cells do not exceed 68 degrees in Winters with [outdoor] temps below twenty degrees." (Plaintiff's Affidavit [# 64], ¶ 22). Shaw also denies that plaintiff ever complained to him about the temperature in his cell. (Shaw Affidavit, ¶ 19). McGinnis indicates that he does not recall ever receiving a letter from plaintiff regarding his sheets. (See, McGinnis Affidavit, ¶ 98). Defendants also indicate that, pursuant to prison rules, plaintiff was only supposed to place one set of sheets in the laundry.

Much of the defendants' arguments as to this claim center upon the fact that, pursuant to prison guidelines, inmates are not supposed to put both sets of sheets into the laundry at the same time. By emphasizing this point, defendants seem to be suggesting that it is plaintiff's own fault that he lost both sets of sheets. The Court disagrees. First, defendants do not claim that plaintiff destroyed his sheets, or that he was in any way responsible for the loss of his two sets of sheets. Rather, it seems undisputed that the sheets were lost due to the prison laundry's mistake. Second, plaintiff indicates in his affidavit that "prisoners are so cold in D–Block, both sets [of sheets] are used daily." (Plaintiff's Opposition [# 58], ¶ 92). Third, in Cleveland's affidavit, he states that if in inmate fails to report a discrepancy with their laundry, they must pay to replace the missing items. (Cleveland Affidavit [# 48], ¶¶ 20–21). To the Court, this suggests that if the inmate does immediately notify the prison of a laundry discrepancy, that he will have the missing items replaced at no cost. However, plaintiff did immediately notify the defendants, and apparently, as a result, received no additional sheets.

■ Having considered all of the foregoing principles, the Court finds that there is a triable issue of fact as to whether or not plaintiff has demonstrated an 8th Amendment violation. Plaintiff claims that for approximately three weeks during the winter he was kept in a cold, drafty cell, without his bed sheets, and with only one blanket. Plaintiff does not claim that he was deprived of his clothing. Clearly, these facts are not nearly as egregious as most of the cases cited above. However, there are several matters which are unclear in the record, such as the actual temperature in plaintiff's cell, the condition of the sheets he received on November 26th, the sufficiency of his blanket, and the condition of the allegedly drafty window and its location in relation to plaintiff's cell.[9] Accordingly, the Court will deny summary judgment on this claim and leave these issues to be resolved at trial.

9. In their memorandum of law, defendants make a passing reference to a qualified immunity defense: "At the very least, given the facts regarding the temperatures, defendants are entitled to qualified immunity." (Memo of Law [# 47], p. 32). However, even if the court were to treat this defense as having

## Plaintiff's Claims Pertaining to the Alleged Assault

Plaintiff's sixteenth claim alleges that, on August 29, 1998, another inmate attacked him, and that defendants Gantert, Furman, Hughson, and Ameigh witnessed the attack but failed to take action to protect him. Defendants have not moved for summary judgment as to this claim, and accordingly, that claim may go forward.

## Due Process Claim Against Cerio

For his nineteenth cause of action, plaintiff alleges that on September 8, 1998, although he was innocent, defendant Cerio found him guilty at a disciplinary hearing on charges of fighting and refusing to obey a direct order. The evidence at the hearing showed that, on August 29, 1998, plaintiff was in the facility visiting room, when he was attacked by another inmate. Plaintiff knocked the other inmate to the ground and punched him repeatedly, despite being told to stop by corrections officers. Plaintiff was found guilty and sentenced to four months in the SHU, with a loss of four months of good time credit. Plaintiff filed an appeal with Donald Selsky, DOCS Director of Special Housing/Inmate Disciplinary Program, and stated, *inter alia,*

> *I stated no objections since my hearing officer did a fair job.* I only ask you to review my appeal and be fair .... All I ask is will you modify this, remove recommended 4 months loss of good time. I don't care about 4 months SHU, I'll be here till 2006 anyway. I shouldn't lose good time for defending myself.

(Plaintiff's Exhibits to Claim # 19)(emphasis added). In response, Selsky reduced plaintiff's sentence to two months in SHU and loss of two months of good time credit. (*Id.*).

Plaintiff now contends that Cerio's determination was erroneous, because he was being attacked and had the right to defend himself. Plaintiff also alleges that McGinnis conspired to assign Cerio as the hearing officer on the case. McGinnis admits that he assigned Cerio to the case, but indicates that hearing officers are assigned on a rotating basis. (McGinnis Affidavit, ¶ 80, 82). In response, plaintiff admits that hearing officers are assigned on a rotating basis, but contends that "since defendant Cerio became a hearing officer, not one hearing on Tier 3 for assault or fighting as been a 'not guilty.'" (Plaintiff's Affidavit [# 70], ¶ ¶ 80, 83).

The law in this area is well settled:

A prisoner may not properly be deprived of a cognizable liberty interest without due process of law. *See, e.g., Wolff v. McDonnell,* 418 U.S. 539, 555, 556, 94 S.Ct. 2963, 41 L.Ed.2d 935 (1974). In *Superintendent, Massachusetts Correctional Institution v. Hill,* 472 U.S. 445, 105 S.Ct. 2768, 86 L.Ed.2d 356 (1985), the Supreme Court ruled that where the prisoner claims he was denied due process in a prison disciplinary hearing because he was found guilty on the basis of insufficient evidence, the claim must be rejected if there was at least "some evidence" to support the decision. *Id.* at 455, 472 U.S. 445, 105 S.Ct. 2768, 86 L.Ed.2d 356. The Court stated that

> [a]scertaining whether this standard is satisfied does not require examination of the entire record, independent assessment of the credibility of witnesses, or weighing of the evidence. Instead, the relevant question is whether there is any evidence in the record that could support the conclusion reached by the disciplinary board.

been properly briefed, there is an issue of fact as to the temperature in plaintiff's cell.

*Id.* at 455–56, 105 S.Ct. 2768, 86 L.Ed.2d 356 (emphasis added).

*Gaston v. Coughlin,* 249 F.3d 156, 163 (2d Cir.2001).

 Moreover, "a prisoner punished after a disciplinary hearing has not thereby been deprived of a liberty interest unless the punishment imposed an atypical and significant hardship on him in relation to the ordinary incidents of prison life." *Id.* at 162 (*quoting Sandin v. Conner,* 515 U.S. 472, 484, 115 S.Ct. 2293, 132 L.Ed.2d 418 (1995))(internal quotations omitted). There is no bright-line rule for determining whether or not a period of confinement in SHU constitutes an atypical and significant hardship. However, the Second Circuit has held that 101 days of confinement under normal New York State SHU conditions, does not, as a matter of law, constitute such hardship. *See, Colon v. Howard,* 215 F.3d 227, 231 (2d Cir.2000).

Applying the foregoing principles, the Court finds, first, upon its review of the entire record, that plaintiff's sentence did not constitute an atypical and significant hardship, within the meaning of *Sandin.* Second, even assuming that such confinement did constitute an atypical and significant hardship, Cerio would nonetheless be entitled to summary judgment, since it is clear that his determination of plaintiff's guilt was supported by some evidence. As to that, plaintiff does not dispute that he fought with another inmate, rather, he merely opines that he was justified, because he was not the initial aggressor. Moreover, although plaintiff now claims that Cerio convicted him unjustly, he originally admitted that Cerio had been fair. Accordingly, plaintiff's claim against Cerio is dismissed.

## CONCLUSION

For all of the foregoing reasons, plaintiff's motion for summary judgment [# 40]

is denied, and defendants' cross-motion for summary judgment [# 45] is granted in part and denied in part. The following claims are dismissed: all Section 1985 claims; all denial of court access claims (3,4,5,7,8,25,26,28,30); all retaliation claims against Gardner (6,21,23,30); and, the due process claim against Cerio (19). Summary judgment is denied as to the following claims: claims for interference with mail (1,2,25,27); the conditions of confinement claim (29); and the retaliation claim against Shaw (32). Defendants did not seek summary judgment as to the 16th claim. The Court will issue a separate Pretrial Order, and the parties are advised that this matter may be scheduled for trial upon two weeks notice. The Clerk of the Court is directed to delete Richard Cerio's name from the caption of this action.

So ordered.